DAVID, Justice.
In this case, the State seeks to enforce a particular provision of the Indiana Auto-dialer Law against an entity that uses an automated dialing device to deliver prerecorded political messages. The trial court, on cross-motions for preliminary injunction, decided that the entity had a reason *798 able likelihood of success on the merits of its claim that the live-operator requirement of the Autodialer Law violates the free speech clause of the Indiana Constitution.
We hold that the entity’s First Amendment claim would likely fail. We also hold there is no reasonable likelihood of success on the merits of the entity’s claim that the Autodialer Law’s live-operator requirement materially burdens its right to engage in political speech in violation of the state constitution.
Facts and Procedural History
FreeEats.com, Inc. is a provider of prerecorded telephonic messages. It uses an artificially intelligent calling (AIC) system to call residents throughout the United States on behalf of its clients, one of which is the Economic Freedom Fund (EFF). The AIC system can call 1.7 million Indiana residents in seven hours.
The system’s prerecorded messages are interactive: they conduct polls, identify political supporters, deliver political-advocacy messages, and encourage voting. These prerecorded messages delivered through automated dialing devices are sometimes referred to as “roboealls.”
In early September 2006, FreeEats used its AIC system to disseminate a political message in Indiana for the EFF. A legal battle began soon after, and over the years it has developed a complex procedural history that includes separate state and federal lawsuits.
On September 18, 2006, the State filed a complaint in state court for an injunction, civil penalties, attorneys’ fees, and costs against the EFF and ten John Does. The complaint alleged that the defendants had violated Indiana Code section 24-5-14-5(b) (2007), part of the Autodialer Law,[1] in two ways: they made, or caused to be made, roboealls (1) without first obtaining the consent of the subscriber and (2) without using a live operator at the outset of the call to obtain the subscriber’s consent before the message was delivered. The same day, and in the same case, the State filed a motion for preliminary injunction.
Shortly after, on September 21, 2006, FreeEats filed a complaint in federal district court, seeking declaratory and injunc-tive relief to prohibit the State and its then Attorney General Steve Carter from enforcing the Autodialer Law. The complaint alleged that federal law preempts the Au-todialer Law; the Autodialer Law violates the Commerce Clause and the First Amendment; and the Autodialer Law violates the free speech provision, Article 1, Section 9, of the Indiana Constitution. The next day, the State amended its state-court complaint to substitute FreeEats for John Doe 1, and it also filed a motion for preliminary injunction against FreeEats in state court.
In the ongoing federal case, FreeEats filed a motion for preliminary injunction, and the State and Carter filed a motion to dismiss on abstention grounds. In October 2006, the federal district court denied both motions. FreeEats.Com, Inc. v. Indiana ex rel. Carter, No. 1:06-cv-1403-LJM-WTL, 2006 WL 3025810 (S.D.Ind. Oct. 24, 2006). FreeEats appealed.
Meanwhile, the state-court case continued. A significant amount of procedural activity took place from October 2006 until February 2008, including the State substituting Meridian Pacific[2] for John Doe 2.
*799 In the midst of this activity, in September 2007, the Seventh Circuit ruled that the district court should have dismissed the federal case under abstention principles because the State was bringing enforcement proceedings against FreeEats in state court. FreeEats.com, Inc. v. Indiana, 502 F.3d 590, 600 (7th Cir.2007).
On February 22, 2008, FreeEats filed a motion for preliminary injunction, asking the state court to enjoin the State from enforcing the Autodialer Law against calls that disseminate political messages. FreeEats advanced the same arguments as it did in federal district court: the Autodialer Law is invalid under the First Amendment, the Commerce Clause, and Article 1, Section 9 of the Indiana Constitution, and it is also preempted by federal law. In response, the State filed its second motion for preliminary injunction against FreeEats. These motions remained pending for the next two-plus years for various reasons. Finally, in June 2010, the state court issued an order which granted in part and denied in part FreeEats’s motion for preliminary injunction and granted in part and denied in part the State’s motion for preliminary injunction.
Specifically, the trial court granted the State’s motion as it sought to enforce the Autodialer Law’s requirement that FreeEats obtain consent and granted FreeEats’s motion as it sought to enjoin the State from requiring FreeEats to hire live operators to obtain that consent. Consequently, the trial court denied FreeEats’s request to enjoin the State from enforcing the consent requirement and denied the State’s request to enjoin FreeEats from making robocalls without complying with the live-operator requirement.
The trial court ruled that it is permissible under Indiana’s free speech provision to require FreeEats to obtain consent before conveying a prerecorded political message using an automated dialing device. But it also ruled that FreeEats was likely to prevail on its claim that the live-operator requirement imposed a material burden on political speech and thus violated Article 1, Section 9 of the Indiana Constitution. In reaching this conclusion, the court found that FreeEats can obtain consent through its automated system more quickly and more cheaply than through a bank of live operators. As to FreeEats’s other claims, the trial court stated that “[t]he District Court’s analysis and conclusion that FreeEats is unlikely to prevail on the merits of its federal claims is persuasive, but the Court need not address those claims, FreeEats having met its threshold burden under the state constitution.”
The State appealed under Indiana Appellate Rule 14(A)(5), which permits parties to take an interlocutory appeal as a matter of right of an order granting or denying a motion for preliminary injunction. FreeEats did not file an appeal. The State then requested, without opposition, that this Court grant immediate transfer under Indiana Appellate Rule 56(A) and expedited consideration under Indiana Appellate Rule 21(B). This Court granted the State’s request for immediate transfer but denied its request for expedited consideration. The parties have agreed to a stay of the preliminary injunction pending appeal.
Standard of Review
“It is within the sound discretion of the trial court to grant or deny a preliminary *800 injunction])]” Amoco Prod. Co. v. Laird, 622 N.E.2d 912, 915 (Ind.1993). Accordingly, this Court’s review is limited to whether there was a clear abuse of discretion. Id. An abuse of discretion occurs when the trial court misinterprets the law. hid. High Sch. Athletic Ass’n, Inc. v. Martin, 731 N.E.2d 1, 5 (Ind.Ct.App.2000), trans. denied.
Indiana Autodialer Law
The Indiana Autodialer Law regulates the use of autodialers — devices that select and dial telephone numbers and then disseminate prerecorded messages to those numbers. Ind.Code § 24-5-14-1. Among other things, the law prohibits a caller from using an autodialer without the consent of the recipient of the call. Id. § 24-5-14 — 5(b). The caller can either obtain consent prior to the call or at the outset of the call by means of a live operator. Id. Certain types of calls are exempt from the consent and live-operator requirements, such as autodialed calls informing employees of work schedules. Id. § 24-5-14-5(a).
This Court has held that the Autodialer Law applies to noncommercial calls, including calls made to communicate purely political messages. State v. Amencan Family Voices, Inc., 898 N.E.2d 293 (Ind. 2008). American Family Voices did not address any “questions as to the extent to which the Autodialer Law limits and may constitutionally limit the use of autodialers to convey political messages” because those questions were not properly before the Court at the time. Id. at 295. Today, however, we are squarely faced with a constitutional challenge to the Autodialer Law.[3]
A. Threshold Issue and First Amendment Claim
At the outset, we must determine which claims are properly presented on appeal.
The State and FreeEats each filed a motion for preliminary injunction against the other, and the trial court denied each motion in part. FreeEats did not appeal the trial court’s refusal to enjoin the State from enforcing the Autodialer Law’s consent provision — whose language requires FreeEats to obtain consent from the subscriber before delivering prerecorded messages using an automated dialing device. The State, on the other hand, did appeal the trial court’s decision to prohibit it from enforcing the Autodialer Law’s live-operator provision — whose language would require FreeEats to use live operators if FreeEats chose to obtain consent at the outset of the robocalls. Thus, the sole Autodialer Law provision at issue is the live-operator requirement.
The trial court evaluated the Auto-dialer Law’s live-operator requirement only under Article 1, Section 9 of the Indiana Constitution. As stated above, the trial court never reached any of FreeEats’s federal constitutional arguments, but it briefly stated that it found the district court’s reasoning that the live-operator requirement did not violate the First Amendment “persuasive.” FreeEats[4] argues that if this Court does *801 not affirm the trial court’s order on Article 1, Section 9 grounds, then this Court should affirm the order on First Amendment grounds.[5] Essentially, FreeEats presents alternative constitutional arguments: if we determine the Autodialer Law’s live-operator requirement does not violate the free speech provision of the state constitution, then we should determine that it does violate the free speech provision of the Federal Constitution. We do not believe this alternative federal free speech argument is properly before us.
We recognize the principle that “where a trial court has made special findings pursuant to a party’s request under Trial Rule 52(A), the reviewing court may affirm the judgment on any legal theory supported by the findings.” Mitchell v. Mitchell, 695 N.E.2d 920, 923 (Ind.1998). Notably, this case involves two facts that take it out of the purview of this principle: first, this Court is not reviewing a judgment but rather an interlocutory order granting a preliminary injunction; and, second, the trial court’s special findings were not “pursuant to a party’s request” but were mandatory under Indiana Trial Rule 52(A)(1). We believe the first fact is especially significant.
A preliminary injunction is not a final judgment but rather “an extraordinary equitable remedy” that should be granted “in rare instances.” Gary Bd. of Zoning Appeals v. Eldridge, 774 N.E.2d 579, 584 (Ind.Ct.App.2002), trans. denied. Furthermore, due to the provisional nature of a preliminary injunction, the record on review is not fully developed. See Jos. Guidone’s Food Palace, Inc. v. Palace Pharmacy, Inc., 252 Ind. 400, 406, 248 N.E.2d 354, 357 (Ind.1969). Thus, with those considerations in mind, a review of a grant or denial of a preliminary injunction should be confined to the law applied by the trial court, and this Court should evaluate only the merits of arguments reached by the trial court. We find this consistent with the limited and deferential appellate standard of review afforded to trial court rulings on motions for preliminary injunction.
Because we decline to extend the holding from Mitchell to orders granting or denying preliminary injunctions, FrfeeEats’s First Amendment claim is not properly before this Court at this time, as the trial court did not address the merits of that claim. Notwithstanding that fact, we will briefly state why, based on the record before us, FreeEats’s First Amendment claim is likely to fail.
To determine the proper standard for evaluating the Autodialer Law under the free speech provision of the First Amendment, we must determine (1) whether the Autodialer Law is content neutral and (2) what type of forum is involved. See Van Bergen v. Minnesota, 59 F.3d 1541, 1550-53 (8th Cir.1995). A statute similar to the Autodialer Law was challenged on First Amendment grounds in Van Bergen. We find the Eighth Circuit’s First Amendment analysis in that case on point.
The United States Supreme Court has provided that “the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions ‘are justified without reference to the content of the regulated *802 speech.’ ” Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 298, 104 S.Ct. 8065, 82 L.Ed.2d 221 (1984)). Importantly, “[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.” Id. We find the Autodialer Law content neutral because, with limited exceptions, it applies to all autodialed calls regardless of the call’s content. Similar to the exceptions found in the statute in Van Bergen, the exceptions within the Autodialer Law[6] are based on relationships “implying the subscriber’s consent to receive the caller’s communications.” Van Bergen, 59 F.3d at 1550. These relationship-based exceptions do not affect the content neutrality of the Autodialer Law. See id. at 1550-51.
Furthermore, the standards to evaluate limitations on speech “ ‘differ depending on the character of the property at issue.’ ” Frisby v. Schultz, 487 U.S. 474, 479, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (quoting Perry Educ. Assn. v. Perry Local Educators’ Assn., 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). We agree with the comprehensive Van Bergen analysis that “the telephone system is neither a public property nonpublic forum, nor a limited public forum, but a private channel of communication.” 59 F.3d at 1553 (finding support from numerous United States Supreme Court cases to reach that conclusion). There is nothing unusual about the use of the telephone system in this case that would compel us to decide this point differently than the Eighth Circuit decided it.
Accordingly, we conclude that the Autodialer Law is content neutral and that the restriction on speech is made through private channels to reach private residences. In these circumstances, the appropriate test for determining whether the Autodialer Law passes muster under the First Amendment is whether it is narrowly tailored to serve a significant governmental interest while leaving open ample alternative channels for communication of the information. Ward, 491 U.S. at 791, 109 S.Ct. 2746. We find the Autodialer Law meets this standard and thus does not violate the First Amendment.
We first find that the Autodialer Law serves a significant governmental interest. As this Court stated in American Family Voices, the purpose behind the Autodialer Law “is to protect the privacy, tranquility, and efficiency of telephone customers.” 898 N.E.2d at 295. And it is well established that the protection of residential privacy is a significant governmental interest. See, e.g., Frisby, 487 U.S. at 484, 108 S.Ct. 2495. The United States Supreme Court has “repeatedly held that individuals are not required to welcome unwanted speech into them own homes and that the government may protect this freedom.” Id. at 485, 108 S.Ct. 2495.
Robocalls generate a harm that directly impacts the interest of residential privacy. As aptly stated in Van Bergen, the disruption from robocalls “is evident to anyone who has received such unsolicited calls when busy with other activities.” 59 F.3d at 1554. The State notes that “FreeEats has admitted that it can dial more than 1.7 million homes in approximately seven hours and that it might call each home as *803 many as three times before leaving a prerecorded message on an answering machine at targeted homes.”
Furthermore, the Autodialer Law, specifically in regards to its live-operator requirement, is narrowly tailored to serve the interest of residential privacy. “[W]hen a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal.” Hill v. Colorado. 530 U.S. 703, 726, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). The Autodialer Law prohibits FreeEats from disseminating ro-bocalls when FreeEats has not obtained the subscriber’s consent prior to the call or when FreeEats does not use a live operator to obtain the consent at the outset of the call. Thus, FreeEats is free to use its AIC technology once it obtains consent in one of the authorized manners. Importantly, a live operator allows call recipients to decline to listen to the robocalls and request that their residences not be contacted again; in effect, homeowners are empowered to manage the robocalls disseminated to their homes. Thus, while promoting residential privacy, the Auto-dialer Law does not foreclose the use of AIC technology.
Finally, the statute leaves open ample alternative forms of communication. FreeEats and its clients are free to deliver their messages through various methods, such as robocalls preceded by a live operator at the outset, robocalls when prior consent has been given, direct mail, radio, television, etc. Based on the foregoing considerations, this Court finds that FreeEats is likely to fail on its claim that the Autodialer Law runs afoul of the First Amendment.
B. Procedural Posture and Article 1, Section 9 Claim
The State asks this Court to reverse the trial court’s denial in part of its motion for preliminary injunction and the trial court’s granting in part of FreeEats’s motion for preliminary injunction. Essentially, the State’s desired outcome is to have this Court determine that the Auto-dialer Law’s live-operator requirement as applied to FreeEats’s robocalls comports with Article 1, Section 9 of the Indiana Constitution and accordingly enjoin FreeEats from violating that provision.
Generally, to obtain a preliminary injunction, a party must demonstrate the following four elements by a preponderance of the evidence: (1) there exists a reasonable likelihood of success at trial; (2) the remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (3) the threatened injury to the movant outweighs the potential harm to the nonmov-ant from the granting of an injunction; and (4) the public interest would not be disserved by granting the requested injunction. Apple Glen Crossing, LLC v. Trademark Retail, Inc., 784 N.E.2d 484, 487 (Ind.2003). Due to the procedural posture and nature of this case, two different standards relating to preliminary injunctions apply. But under either of these standards, this Court needs to examine only the trial court’s evaluation of the first factor — reasonable likelihood of success at trial.
First, the State is appealing from the trial court’s granting in part of FreeEats’s motion for preliminary injunction. If FreeEats failed to prove any of the four preliminary injunction requirements, then the trial court’s granting in part of its motion was an abuse of discretion. See id. at 487-88. The State asserts that the trial court incorrectly determined that *804 FreeEats had a reasonable likelihood of success on its claim that the Autodialer Law as applied to the robocalls is unconstitutional under Article 1, Section 9. The State does not ask this Court to review the trial court’s evaluation of any other preliminary injunction factor.
Second, the State is appealing from the trial court’s denial in part of its motion for preliminary injunction. The State asserts that the trial court should have granted its preliminary injunction motion to enjoin FreeEats from making the robocalls without complying with the live-operator requirement of the Autodialer Law. This argument invokes the “per se” injunction standard: if the action to be enjoined clearly violates a statute, the public interest is so great that the injunction should issue regardless of whether a party establishes “irreparable harm” or “greater injury.” See Ind. Family & Soc. Servs. Admin, v. Walgreen Co., 769 N.E.2d 158, 161-62 (Ind.2002). In this case, neither party disputes that the robocalls at issue violate the live-operator provision within the Autodialer Law: at issue is the legality of the provision as applied to the robocalls. Thus we need examine only whether the State is correct in asserting that it had a reasonable likelihood of success on the merits of its claim — that the Autodialer Law’s live-operator requirement as applied to FreeEats’s robocalls comports with Article 1, Section 9 of the Indiana Constitution, and thus FreeEats must be enjoined from violating the law.
Under those standards, this Court must evaluate whether either party has a likelihood of success on the merits of its respective claim. We frame the ultimate issue as follows: did the trial court correctly determine that as applied to this case the Auto-dialer Law’s live-operator requirement violates Article 1, Section 9 of the Indiana Constitution?
Indiana Code section 24-5-14-5(b) contains the live-operator provision of the Au-todialer Law at sub-subsection (2):
(b) A caller may not use or connect to a telephone line an automatic dialing-announcing device unless:
(1) the subscriber has knowingly or voluntarily requested, consented to, permitted, or authorized receipt of the message; or
(2) the message is immediately preceded by a live operator who obtains the subscriber’s consent before the message is delivered.
Because FreeEats did not have prior consent of the subscribers under sub-subsection (1), sub-subsection (2) requires FreeEats to obtain consent at the outset of the calls through a live operator.
The trial court found that this live-operator requirement imposed a material burden on FreeEats’s political speech in violation of Article 1, Section 9 of the Indiana Constitution. The trial court acknowledged that the Autodialer Law in general “does not prohibit FreeEats from making political calls” but found that the live-operator requirement “would increase FreeEats’s costs more than tenfold and slow its process of disseminating political messages in Indiana for clients.” The State does not dispute that the speech at issue is political in nature but argues that the live-operator requirement does not impose a material burden on the speech.
Article 1, Section 9 of the Indiana Constitution prohibits the legislature from passing laws “restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever.” It further states that “for the abuse of that right, every person shall be responsible.” Ind. Const, art. 1, § 9. This clause embodies a “freedom-and-responsibility stan *805 dard,” which prohibits the legislature from impairing the flow of ideas but allows it to sanction individuals who commit abuse. Price v. State, 622 N.E.2d 954, 958 (Ind.1993). Claims that a statute violates the free speech clause of the Indiana Constitution are evaluated under a different standard than claims based on the First Amendment of the U.S. Constitution. See, e.g., id.
For Article 1, Section 9 claims, if a statute affects political speech, which is an established core constitutional value, we engage in “material burden” analysis. Id. at 960, 963. In the present case, there is no dispute that the affected speech is political, as it clearly “comment[s] on government action.” Whittington v. State, 669 N.E.2d 1363, 1370 (Ind.1996). This Court has engaged in “material burden” analysis on several occasions, although in factual scenarios quite different than the present one.
In Price v. State, the seminal case addressing Article 1, Section 9 in the context of political speech, this Court examined the constitutionality of Indiana’s disorderly conduct statute. The defendant was arrested and ultimately convicted of disorderly conduct after her noisy protest on how police officers were treating her and other individuals. 622 N.E.2d at 957. The defendant appealed her conviction on several theories — one was that the disorderly conduct statute violated the free speech clause of the state constitution. Id. After determining that the content of the defendant’s speech was political, this Court shifted the focus to whether the statute, as applied, imposed a material burden on the speech. Id. at 963. We enunciated several important components of “material burden” analysis. First, “we look only at the magnitude of the impairment.” Id. at 961 n. 7. “If the right, as impaired, would no longer serve the purpose for which it was designed, it has been materially impaired.” Id. Second, “treating as abuse political speech which does not harm any particular individual (‘public nuisance’) does amount to a material burden, but that sanctioning expression which inflicts upon determinable parties harm of a gravity analogous to that required under tort law does not.” Id. at 964. With these considerations in mind, we noted that given the ongoing commotion at the time the defendant began shouting her protest at the officers, the State could not establish a link between the defendant’s conduct and any particularized harm that was suffered. Id. Any harm suffered by individuals observing the scene was not more than “a fleeting annoyance,” and the defendant’s actions were not analogous to conduct that “would sustain tort liability against the speaker.” Id. In essence, arresting the defendant for disorderly conduct based on her political speech, when her conduct could not be considered abuse under the particular facts, was a material burden on the defendant’s right to engage in political speech.
Several cases following Price elaborated on “material burden” analysis. In Whit-tington, a case also addressing the disorderly conduct statute, this Court stated that “[o]ur opinion in Price suggests that state action does not impose a material burden on expression if either the ‘magnitude of the impairment’ is slight or the expression threatens to inflict ‘particularized harm’ analogous to tortious injury on readily identifiable private interests.” Whittington, 669 N.E.2d at 1370 (internal citations omitted).[7] And in a case address *806 ing a state statute that imposed certain requirements before a woman could get an abortion, this Court held that “a state regulation creates a material burden if it imposes a substantial obstacle on a core constitutional value serving the purpose for which it was designed” but that there is no material burden with a “less than a substantial obstacle” under most circumstances. Clinic for Women, Inc. v. Brizzi, 837 N.E.2d 973, 984 (Ind.2005).[8]
Thus, determining whether a statute imposes a material burden on political speech may involve two components: “magnitude of the impairment” analysis and “particularized harm” analysis. Under “magnitude of the impairment” analysis, we look at whether there has been a substantial obstacle on the right to engage in political speech. The important inquiry is whether the right to engage in political speech, as affected, no longer serves the purpose for which it was designed. If a substantial obstacle does not exist, there is no material burden on the right to engage in political speech. But if a substantial obstacle does exist, we also engage in “particularized harm” analysis: we look at whether the speaker’s actions are analogous to conduct that would sustain tort liability against the speaker. If there is a “particularized harm,” then we conclude that the state action does not impose a material burden on the right to engage in political speech. Conversely, a lack of “particularized harm” means there is a material burden. Ultimately, a material burden on political speech exists only in the presence of a substantial obstacle on the right and the absence of particularized harm caused by the speaker.
The State argues (1) that the live-operator requirement’s impairment on FreeEats’s speech is slight and (2) that FreeEats’s robocalls are akin to tort-like conduct. FreeEats, on the other hand, argues that because the live-operator requirement increases its costs and reduces the number of calls it can make within a given period of time, there is a significant impairment on its political expression. Furthermore, FreeEats contends that its robocalls are not excessive enough to be analogous to an actionable tort based on invasion of privacy or the like.
We find that this issue can be resolved on “magnitude of the impairment” grounds and thus find it unnecessary to address the State’s argument that the robocalls inflict “particularized harm analogous to tortious injury.” For the reasons explained below, we hold that the live-operator requirement of the Autodialer Law does not impose a substantial obstacle on FreeEats’s right to engage in political speech.
We agree with the State that FreeEats’s right to engage in political speech continues to serve its purpose notwithstanding the live-operator requirement of the Auto-dialer law. The State elaborates on this argument: (1) the Autodialer Law does not prohibit the dissemination of political speech; (2) FreeEats and its clients may continue to use the AIC system as long as they obtain the residents’ consent in either of the prescribed manners; and (3) despite the Autodialer law, FreeEats and its *807 clients are free to broadcast their messages and engage in political discourse in countless other ways.
In Price, the disorderly conduct statute’s operation blocked the defendant’s ability to engage in political expression. We recognize that an arrest and criminal conviction for nonabusive political speech clearly falls on the substantial-obstacle end of the spectrum. Not every restraint will be as easily definable, and this Court recognizes that lesser restraints may also present substantial obstacles to engage in political speech. But the State has explained why the magnitude of the impairment in this case does not rise to an Article 1, Section 9 violation — the live-operator requirement of the Autodialer Law does not, for various reasons, present a substantial obstacle to the purpose underlying FreeEats’s right to engage in political expression. Furthermore, FreeEats’s only substantial-obstacle argument is an economic one — that it is more expensive to make political calls if it complies with the live-operator requirement of the Autodialer Law. This purely economic burden is not the type of substantial obstacle that Price contemplated.
The Autodialer Law prevents FreeEats from sending prerecorded political messages without obtaining the telephone subscriber’s consent. FreeEats can obtain this consent prior to the call or at the outset of the call by using a live operator. FreeEats is correct in noting that its costs will increase if it complies with the live-operator requirement, but FreeEats fails to introduce any convincing argument that the result of the requirement is that its right to engage in political expression no longer serves the purpose for which it was designed. Any content-neutral statute that incidentally affects political expression could conceivably increase the economic costs of the speaker. A conclusion that a statute violates the state constitution when it increases the economic costs to engage in political expression, without any showing that the right to political expression no longer serves its purpose, would be unsound. FreeEats and its clients are still free to engage in political expression and are free to use the AIC system to do so. Although the Autodialer Law’s live-operator provision is a less-than-ideal requirement for FreeEats, it is not a material burden on its right to engage in political expression.
Conclusion
We find that the trial court incorrectly found that FreeEats had a reasonable likelihood of success on its claim that the live-operator provision of the Autodialer Law violates Article 1, Section 9 of the Indiana Constitution. Accordingly, we reverse the trial court’s granting in part of the preliminary injunction in favor of FreeEats and reverse the trial court’s denial in part of the preliminary injunction against the State. We remand to the trial court for further proceedings.
SHEPAED, C.J., and DICKSON and RUCKER, JJ., concur.
SULLIVAN, J., dissents with separate opinion.

. Ind.Code §§ 24-5-14-1 to -13 (2007).

. The law firm representing EFF has also represented Meridian Pacific in the proceedings below. EFF’s brief on appeal states that "Meridian Pacific, Inc. does not participate in this appeal.... Any interests it might have in the outcome of this matter are adequately *799 asserted in this brief by EFF.” We note that under Indiana Appellate Rule 17(A), Meridian Pacific is also a party on appeal.

. Although it does not affect today’s decision, we note that in September 2011, the U.S. District Court for the Southern District of Indiana determined that Indiana’s Autodialer Law is preempted by federal law. Patriotic Veterans, Inc. v. Indiana ex rel. Zoeller, No. 1:10-cv-723-WTL-TAB, 2011 WL 4479071, at *4 (S.D.Ind. Sept. 27, 2011). We further note that the State and Attorney General Gregory F. Zoeller have filed a notice of appeal in that case. Notice of Appeal, Patriotic Veterans, Inc. v. Indiana ex rel. Zoeller, No. 1:10-cv-723-WTL-TAB, 2011 WL 4479071 (S.D.Ind. Oct. 3, 2011), ECF No. 47.

. FreeEats and the EFF filed separate briefs in this appeal, but their interests are aligned, and their arguments are substantially similar. *801 For ease of discussion, we may now refer to the appellees, collectively, as FreeEats.

. FreeEats requests this Court to remand the case back to the trial court to address its other federal constitutional challenges in the event this Court rejects both its state and federal free speech arguments.

. The exceptions within the Autodialer Law include messages "(1) from school districts to students, parents, or employees; (2) to subscribers with whom the caller has a current business or personal relationship; [and] (3) advising employees of work schedules.” I.C. § 24-5-14-5(a).

. Whittington, like Price, involved a defendant's loud protest during a police investigátion and an Article 1, Section 9 challenge to the disorderly conduct statute. Ultimately, *806 unlike Price, the defendant's speech in Whit-tington was not political, and thus material burden analysis was not appropriate in that case. Whittington, 669 N.E.2d at 1370.

. The majority in Clinic for Women left open the issue of whether the right to have an abortion was a core constitutional value under Article 1/Section 1 of the Indiana Constitution. Instead, the majority deter mined that even if the right to have an abortion were a core constitutional value, the state statute at issue did not impose a material burden on that right. Clinic for Women, 837 N.E.2d at 988.