

# IN THE
# Court of Appeals of Indiana

Xavier Isiah Alexander,

*Appellant-Defendant*



FILED

Jan 21 2026, 9:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

State of Indiana,

*Appellee-Plaintiff*

---

January 21, 2026

Court of Appeals Case No.
25A-CR-1616

Appeal from the Marion Superior Court

The Honorable Amy M. Jones, Judge

Trial Court Cause No.
49D34-2503-CM-8653

---

**Opinion by Judge Scheele**
Judges Brown and Felix concur.

**Scheele, Judge.**

## Case Summary

Xavier Isiah Alexander appeals his conviction for Class B misdemeanor harassment raising two issues which we restate as: whether the evidence was sufficient to show Alexander communicated via electronic means with the intent to harass, annoy, or alarm but with no intent of legitimate communication; and whether Indiana Code section 35-45-2-2(a)(4)(A) is unconstitutional as applied to him because it proscribed his protected speech. We affirm.

## Facts and Procedural History

Alexander and D.J. were in a romantic relationship that ended in March 2022. Sometime between March 2022 and August 2024, D.J. "asked [Alexander] not to contact [her] again." Tr. Vol. II p. 18.

On August 25, 2024, Alexander sent a text message about himself and his feelings to D.J.; she did not respond. On September 10, Alexander sent D.J. another text message with a link to a song posted on YouTube. This time, D.J. responded telling Alexander, "I have a restraining order on you so you shouldn't be contacting me. Leave me tf alone."[1] Ex. Vol. I p. 4. D.J. "blocked"

---

[1] There is no "restraining" order in the record from before September 2024. The record does contain a no-contact order issued in March 2025, after charges in the instant case were filed. In any event, no issues on appeal are raised regarding D.J.'s statement that a restraining order was in place before September 10, 2024.

Alexander's original telephone number, but Alexander continued to text and call her from other phone numbers and "from text app." Tr. Vol. II p. 17.

[4] On approximately December 15, Alexander texted D.J. again. D.J. called the number to determine who was texting her. After learning it was Alexander, D.J. said, "[O]h my gosh, stop calling me[,]" and she hung up the phone. *Id.* at 21. On December 16, Alexander sent D.J. another text, apologizing for contacting her the day before and telling D.J. there was "[n]o need to call the police[.]" Ex. Vol. I p. 5.

[5] On December 19, Alexander sent D.J. a text that said, "Ain't go lie yall mouths reckless I want yall all to die from homicide fuck you and all your people bitch… I hate your scary ass too bitch… don't be sorry[.]" *Id.* at 6 (errors in original). D.J. responded, telling Alexander to "[s]top reaching out to [her] for the MILLIONTH TIME." *Id.* D.J. also told him that she was going to call the police because it had been three years since their split and he was still reaching out to her. Later at trial, Alexander claimed he sent the text message referencing homicide in response to a message from D.J. saying "she hates [him], [he's] a weirdo, and she hoped [he] die[s] from cancer." Tr. Vol. II p. 34. However, Alexander acknowledged that the message referencing cancer was not introduced into evidence. Alexander sent D.J. a final text message on December 21 apologizing again and acknowledging that D.J. "told [him] a million times" to stop. Ex. Vol. I p. 7.

D.J. contacted the police and showed them the text messages from Alexander. In March 2025, the State charged Alexander with Class B misdemeanor harassment. On June 3, the trial court held a bench trial. Alexander admitted he sent the text messages to D.J. and acknowledged that D.J. told him to leave her alone. The trial court found Alexander guilty as charged and sentenced him to 180 days executed in the Marion County Jail. Alexander now appeals.

## Discussion and Decision

Alexander challenges whether the State presented sufficient evidence to prove he lacked an intent to legitimately communicate with D.J. and alleges the speech contained in the text messages he sent was constitutionally protected.

> We approach a typical sufficiency challenge with "great deference" to the fact-finder. *Brewington v. State*, 7 N.E.3d 946, 955 (Ind. 2014). That is, "[w]e neither reweigh evidence nor judge witness credibility." *Gibson v. State*, 51 N.E.3d 204, 210 (Ind. 2016). Moreover, we view the "evidence and reasonable inferences drawn therefrom in a light most favorable to the conviction and will affirm 'if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.' " *Walker v. State*, 998 N.E.2d 724, 726 (Ind. 2013) (quoting *Davis v. State*, 813 N.E.2d 1176, 1178 (Ind. 2004)). However, to the extent the instant appellate issues implicate principles of freedom of speech, the Indiana Supreme Court has held that "[d]eferential review ... creates an unacceptable risk of under-protecting speech." *Brewington*, 7 N.E.3d at 955. Indeed, because of the importance of protecting free public discourse, we have a "constitutional duty," *id.*, to independently examine the record "to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of

free expression," *Journal-Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446, 455 (Ind. 1999) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 285, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). This rule of independent review—conducted de novo—"assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact," no matter whether the trier of fact is a judge or a jury. *Brewington*, 7 N.E.3d at 955 (quoting *Bandido's*, 712 N.E.2d at 455).

*McGuire v. State*, 132 N.E.3d 438, 442-43 (Ind. Ct. App. 2019), *trans. denied.*

## I. Sufficiency of the Evidence

[8] To convict Alexander of harassment as charged, the State was required to prove beyond a reasonable doubt that Alexander "use[d] a . . . form of electronic communication to . . . communicate with a person" "with intent to harass, annoy, or alarm another person but with no intent of legitimate communication[.]" Ind. Code § 35-45-2-2(a)(4)(A) (1996). Alexander does not dispute that he sent the text messages to D.J., but asserts the State failed to prove that he did not intend a legitimate communication. He contends he sent the text messages with the legitimate intent "to apologize and to help him moving on with his life and obtaining closure." Appellant's Br. p. 9. Alexander concedes, however, that "[t]he only communication that did not serve this purpose" was the one message wherein he wished D.J. dead by homicide. *Id.*

[9] We have used an objective standard to determine whether communications are made with intent to harass, annoy, or alarm; that is, whether the statements would harass, annoy, or alarm a "reasonable" person. *Leuteritz v. State*, 534 N.E.2d 265, 267 (Ind. Ct. App. 1989). A finding that there was no intent of

legitimate communication "is a factual determination which will be disturbed only upon a showing [that] no substantial evidence of probative value exists from which the trier of fact could reasonably infer the defendant was guilty beyond a reasonabl[e] doubt." *Brehm v. State*, 558 N.E.2d 906, 908 (Ind. Ct. App. 1990).

[10] As Alexander concedes, his December 19 message to D.J. does not contain any apology or commentary about moving on, which he alleges would show a legitimate intent. Instead, Alexander calls D.J. multiple profane names and tells her, "Ain't go lie yall mouths reckless I want yall all to die from homicide fuck you and all your people bitch… I hate your scary ass too bitch… don't be sorry[.]" Ex. Vol. I p. 6 (errors in original). A reasonable person would feel harassed, annoyed, or alarmed by such statements. Thus, this message alone was sufficient to prove Alexander committed harassment by intending to harass, annoy, or alarm D.J. without intent of legitimate communication.

[11] Still, Alexander concludes the other messages "could not reasonably be considered a campaign of harassment or annoyance." Appellant's Br. p. 9. In support of his argument, Alexander simply recounts the text messages and testimony presented and contends that we should reach a different result than the trial court. Alexander also contends the trial court "believed that, once a person asks another to stop contacting them, any further communication made for any reason is a per se violation of [Indiana Code section] 35-45-2-2(a)(4)(A)." Appellant's Br. p. 10 (emphasis omitted). We disagree.

[12]    Here, Alexander acknowledged that D.J. told him to leave her alone and admitted he sent her multiple text messages despite her direction to stop communicating with her. D.J. testified that Alexander's original number was "blocked" on her phone, so Alexander contacted her from other phone numbers. Tr. Vol. II p. 17. D.J. repeatedly told Alexander to stop contacting her after learning a message or phone call was from him. Specifically, D.J. said things like "stop texting my fucking phone" and "oh my gosh, stop calling me" to Alexander. *Id.* at 19, 21. Alexander texted D.J. at least five times between August and December 2024, despite the passage of at least two years since their break-up and her unequivocal direction that he not communicate with her. The court did not rely on the mere fact that Alexander communicated with D.J. on an individual occasion after her request that he stop. Rather, the court concluded Alexander's continuous communication "is harassing" and "it's annoying that she has to the[n] guess what person is now texting her, what number should she guess to block this week." *Id.* at 41. The evidence was substantially probative and sufficient for the trial court to reasonably infer Alexander intended to annoy, harass, or alarm D.J. without the intent of legitimate communication. *See Brehm*, 558 N.E.2d at 908.

## II. Constitutionality

[13]    Alexander asserts the harassment statute as applied to him is unconstitutional because his communications with D.J. were protected free speech under the United States and Indiana Constitutions. As we noted in *McGuire*, the intent-of-legitimate-communication issue collapses into the constitutional-free-speech

issue because "we have interpreted the statutory phrase 'no intent of legitimate communication' as creating a 'specific intent requirement preclud[ing] the application of this statute to constitutionally protected legitimate communications.'" *McGuire*, 132 N.E.3d at 444 (quoting *Kinney v. State*, 404 N.E.2d 49, 51 (Ind. Ct. App. 1980)).

## A. Waiver

As an initial matter, the State contends that Alexander's Article I, Section 9 claim under the Indiana Constitution is waived because Alexander failed to make an independent argument. Indiana courts employ a two-step inquiry for challenges under Article 1, Section 9, which is distinct from a First Amendment analysis. *See McGuire*, 132 N.E. 3d at 444-45. Because Alexander failed to provide such an independent argument, we agree his Article 1, Section 9 claim is waived. *South Bend Trib. v. Elkhart Cir. Ct.*, 691 N.E.2d 200, 202 n. 6 (Ind. Ct. App. 1998) (Article 1, Section 9 argument was waived where appellant failed to make a separate argument on that claim), *trans. denied*.

The State also argues Alexander's First Amendment claim is waived because it was not raised before the trial court. It is well established that issues may not be raised for the first time on appeal, including constitutional issues. *See e.g.*, *Washington v. State*, 840 N.E.2d 873, 880 (Ind. Ct. App. 2006) (appellant waived review of his Sixth Amendment claim that was not raised before the trial court), *trans. denied*; *Plank v. Comm. Hosps. of Ind., Inc.*, 981 N.E.2d 49, 53 (Ind. 2013) ("[T]he general rule is that failure to challenge the constitutionality of a statute at trial results in waiver of review on appeal[.]"). However, "appellate courts

are not prohibited from considering the constitutionality of a statute even though the issue otherwise has been waived[,] [a]nd indeed a reviewing court may exercise its discretion to review a constitutional claim on its own accord." *Plank*, 981 N.E.2d at 53-54. Although Alexander failed to raise the First Amendment issue before the trial court, we exercise our discretion to review his constitutional claim.

## B. First Amendment

[16] The harassment statute regulates speech, which is protected under the First Amendment. *McGuire*, 132 N.E.3d at 442. In relevant part, the First Amendment states, "Congress shall make no law ... abridging the freedom of speech ...". U.S. Const. amend. I. To determine the proper standard for evaluating the harassment statute under the First Amendment, "we must determine (1) whether the [statute] is content neutral and (2) what type of forum is involved." *State v. Econ. Freedom Fund*, 959 N.E.2d 794, 801 (Ind. 2011), *reh'g. denied*. "[T]he government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech." *Id.* at 801-02 (internal quotations and citations omitted). A restriction on speech that is unrelated to the content of expression is deemed neutral, "even if it has an incidental effect on some speakers or messages but not others." *Price v. State*, 622 N.E.2d 954, 965 (Ind. 1993), *reh'g. denied*. "Furthermore, the standards to evaluate limitations on speech 'differ depending on the character of the property at

issue.'" *Econ. Freedom Fund*, 959 N.E.2d at 802 (quoting *Frisby v. Schultz,* 487 U.S. 474, 479 (1988)).

[17] We have held that some portions of the harassment statute are content-neutral because it only applies to an intent to engage in speech rather than to the content of the speech itself, and it does not apply to an intent to legitimately communicate. *Compare Stone v. State*, 128 N.E.3d 475, 481-82 (Ind. Ct. App. 2019) (interpreting the harassment statute as content-neutral where a person must, with the intent to harass, annoy, or alarm another and without the intent of legitimate communication, "make[] a telephone call, whether or not a conversation ensues" I.C. §35-45-2-2(a)(1)), *trans. denied*, *with McGuire*, 132 N.E.3d at 438 (analyzing the validity of a conviction under the harassment statute based on the communication's content where a person must, with the intent to harass, annoy, or alarm another and without the intent of legitimate communication, "use[] a computer network ... or other form of electronic communication to ... transmit an obscene message or indecent or profane words to a person[.]" I.C. §35-45-2-2(a)(4)(B)).

[18] In the instant case, the State charged Alexander under Indiana Code section 35-45-2-2(a)(4)(A), which requires that "[a] person . . . with intent to harass, annoy, or alarm another person but with no intent of legitimate communication . . . uses a . . . form of electronic communication to . . . communicate with a person[.]" This statutory language does not distinguish between protected and prohibited speech on the basis of content; rather, the statute focuses expressly on the speaker's intent by the act of communicating to a person, not on the

content of his regulated speech within the communication. *See Stone*, 128 N.E.3d 481-82. Moreover, "the telephone system is neither a public property nonpublic forum, nor a limited public forum, but a private channel of communication." *Econ. Freedom Fund*, 959 N.E.2d at 802 (internal quotation and citation omitted). In the instant case, the method of electronic communication used to transmit text messages was a cellular telephone system. Because Indiana Code section 35-45-2-2(a)(4)(A) is content-neutral and applies to speech made through private channels to reach private persons, "the appropriate test for determining whether the [harassment statute] passes muster under the First Amendment is whether it is narrowly tailored to serve a significant governmental interest while leaving open ample alternative channels for communication of the information." *Id.*

[19] "[I]t it is well established that the protection of residential privacy is a significant governmental interest" and "individuals are not required to welcome unwanted speech into their own homes[.]" *Econ. Freedom Fund*, 959 N.E.2d at 802. Indiana Code section 35-45-2-2(a)(4)(A) is narrowly tailored to serve the significant governmental interest of "the privacy, tranquility, and efficiency of telephone customers." *Econ. Freedom Fund*, 959 N.E.2d at 802 (holding the same regarding the "Autodialer Law"); *see also Stone*, 128 N.E.3d at 482 (holding there is a substantial public interest in protecting people from telephone harassment). Moreover, the harassment statute does not apply to speech intended to legitimately communicate and leaves open ample alternative forms of communication of information. In the instant case, the court even

noted its understanding that Alexander may want to communicate "things . . . to get it off [his] conscience . . . and apologize and make amends so [he] can have closure" but that Alexander could have done so through other forms of communication such as journaling. Tr. Vol. II pp. 40-41. The statute is narrowly tailored to serve its legitimate purpose.

[20] Finally, even if the statute as applied to Alexander were content-based, certain categories of speech are simply unprotected by the First Amendment. *McGuire*, 132 N.E.3d 444. One such "proscribable category" is speech that constitutes a "true threat[.]" *Id.* (citing *Virginia v. Black¸*538 U.S. 343, 359 (2003)). A true threat requires "two necessary elements: that the speaker intend his communications to put his targets in fear for their safety, and that the communications were likely to actually cause such fear in a reasonable person similarly situated to the target[.]" *Id.* (quoting *Brewington*, 7 N.E.3d at 964). Here, Alexander said in one message to D.J., "I want yall all to die from homicide fuck you and all your people bitch… I hate your scary ass too bitch… don't be sorry[.]" Ex. Vol. I p. 6 (errors in original). It is difficult to conceive any intention other than to put a target in fear for her safety when wishing her death by homicide. And it is likely that a reasonable person in D.J.'s place would fear Alexander after he wished for her murderous death and told her, "[D]on't be sorry[.]" *Id.* Thus, this speech amounted to a constitutionally proscribable true threat and can be regulated. *See McGuire*, 132 N.E.3d 444 (citing *Brewington*, 7 N.E.3d at 978 (the First Amendment "does not permit threats against the safety and security of any American, . . . regardless of

whether those threats are accompanied by some protected criticism")). Therefore, the harassment statute does not violate the First Amendment either facially or as applied to Alexander.

## III. Conclusion

[21] The State provided sufficient evidence to prove beyond a reasonable doubt that Alexander committed harassment under Indiana Code section 35-45-2-2(a)(4)(A). Additionally, the regulation of Alexander's speech was constitutionally permissible and did not violate his First Amendment right to free speech. We affirm the judgment of the trial court.

[22] Affirmed.

[23] Brown, J., and Felix, J., concur.

ATTORNEYS FOR APPELLANT

Steven J. Halbert
Talisha R. Griffin
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana